# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:07cv163-RJC

| | | |
|---|---|---|
| **SHELL TRADEMARK MANAGEMENT BV & MOTIVA ENTERPRISES, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **RAY THOMAS PETROLEUM COMPANY, INC. & L. RAY THOMAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** is before the Court on the parties' cross motions for partial summary judgment (Doc. Nos. 61 & 63), related memoranda (Doc. Nos. 62, 67, 71, 75, 76, 65, 70, 88, & 89), and Defendants' Motion to Strike and Memorandum in Support (Doc. Nos. 78 and 79), Plaintiffs' Response (Doc. No. 84), and Defendants' Reply (Doc. No. 86). After reviewing arguments by the parties and appropriate case law, the Court GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment (Doc. No. 61), GRANTS in part and DENIES in part Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 63), and DENIES Defendants' Motion to Strike (Doc. No. 78).

## I. FINDINGS OF FACT

This suit arises out of contracts between Plaintiffs, Shell Trademark Management BV and Motiva Enterprises, LLC, (collectively "Motiva") and Defendants, Ray Thomas Petroleum Company, Inc. ("RTP") and L. Ray Thomas ("Thomas"). These contracts all relate to the buying

and selling of petroleum between Motiva and RTP. Motiva is a joint venture between Shell Oil Company and Saudi Refining Inc., engaged primarily in refining and marketing petroleum products under the "Shell" brand. Motiva, through Shell, is the owner of numerous trademarks, including SHELL and SHELL PECTEN DESIGN. RTP, a gasoline wholesaler and retailer, is a corporation organized under the laws of North Carolina which supplies gasoline to several gas stations in North Carolina and South Carolina and also owns and operates gas stations. Thomas is the President of RTP.

From July 1996 until September 2006, RTP was a Shell-branded wholesaler, supplying gasoline to six retail stations in North and South Carolina. (Doc. No. 63-2 at 3). There are four types of agreements currently regulating the relationship between Motiva and RTP. First, on June 1, 1996, Thomas entered into a personal Guaranty with Motiva. Second, the parties entered into three Jobber Incentive Agreements (collectively "Jobber Agreements") on September 15, 1997, August 13, 1999, and November 1, 2004. Third, the parties entered into the Wholesale Marketer Agreement ("WMA") with an effective date of January 1, 2004. The fourth agreement is a settlement agreement between the parties from December of 2004 ("2004 Settlement Agreement"). The 2004 Settlement Agreement is an amendment to the WMA.

As part of Motiva's efforts to maintain the Shell brand name and its contracts, Motiva has an on-going relationship with Authentix, an independent testing company, to test gasoline samples from Shell-branded gas stations. Authentix tests for certain additives in the gasoline which distinguish the product as a Shell product. Authentix suspects commingling of gas when low amounts of the additives are found, indicating a mixture of Shell and non-Shell gasoline. In the gasoline industry, the term "misbranding" is often used to denote a complete lack of the additives,

indicating that no Shell gasoline is present in the tank; however, sometimes the terms "commingling" and "misbranding" are interchanged.

In June of 2004, Authentix gave Motiva testing results, which according to Motiva, showed that RTP was commingling Shell-branded gasoline with other gasoline and selling it to consumers as Shell gasoline. Although RTP never admitted to commingling gas, RTP entered into the 2004 Settlement Agreement under which RTP paid Motiva to forego its right to sue RTP for commingling and further clarified the damages and rights of Motiva if RTP were to commingle. The 2004 Settlement Agreement became effective December 2004.

Less than a year and a half later, in May 2006, Motiva's Area Manager contacted Eugene Goll, Operations Manager, to inform him that RTP might be misbranding. Goll contacted an analyst within Motiva to compare the consumer credit card sales at RTP stations to the gas purchased by RTP from Motiva. This analyst emailed Goll on June 1, 2006, concluding under his analysis that RTP "is DEFINITELY comingling [sic]." (Doc. No. 62-12 at 1). On that same day, Goll emailed Authentix, requesting that Authentix test RTP stations in compliance with Motiva's policies when misbranding is suspected. These test results indicated likely commingling or misbranding of gasoline at two of RTP's gasoline stations. Authentix re-tested the stations from June 30, 2006 through July 3, 2006 which revealed results indicating commingling or misbranding at four RTP stations. After getting the second test results, Motiva asked Authentix to conduct an investigation to determine if any terminal or operational issues within Motiva could explain the testing data. (Doc. No. 67-7 at 3).

On August 29, 2006, Authentix notified Goll that it completed its investigation into terminal and operational issues and found no operational errors that could have caused the failing test results

at RTP locations. (Doc. No. 67-7 at 3-4). Goll submitted his recommendation of termination along with Authentix's findings to his superiors and Shell's legal department. (Id.). The legal department reviewed the results and related contracts to decide whether to terminate a franchise relationship. (Id.). It took approximately three weeks for the legal department to review the results and contracts, decide the appropriate action, and draft the legal notice of termination. (Id.). On September 26, 2006, Motiva notified RTP that it was terminating the parties' franchise relationship, the WMA, and the Jobber Incentive Agreements, effective October 31, 2006. RTP continued to misbrand and commingle at least until the date of notice of termination. (Doc. No. 75-2 at 2).

RTP does not contest that it sold non-Shell gasoline at its stations. (Doc. No. 65 at 2). Documents produced by RTP during discovery show that these gas stations sold a substantial amount of non-Shell gasoline and that this non-Shell gasoline was delivered to the stations for sale as late as the day Motiva notified RTP of the termination (Doc. No. 75-2 at 2-15).

Motiva seeks summary judgment on the allegations that RTP violated: (1) the Lanham Act; (2) the North Carolina Unfair and Deceptive Trade Practices Act; and (3) the South Carolina Unfair Trade Practices Act; and that RTP breached (1) the parties' Wholesale Marketer Agreement ("WMA"); (2) the 2004 Settlement Agreement; and (3) the Jobber Incentive Agreements. Further, Motiva seeks summary judgment against Thomas to enforce the terms of a Guaranty and on the counterclaims brought by RTP. Defendants seek summary judgment on their counterclaims which allege that Motiva is liable to RTP for improperly terminating the Motor Fuel Supply Agreement and violating the Petroleum Marketing Practices Act (the "PMPA"). Thomas seeks summary judgment that he is not liable to Motiva under his Guaranty.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. However, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

### III.   TERMINATION OF RELATIONSHIP UNDER THE PMPA

#### A. RTP Claims Notice was Inadequate or Untimely

RTP contends that Motiva's termination of the franchise relationship violated the PMPA because it was either inadequate notice or it was untimely notice.  RTP emphasizes that the PMPA requires Motiva to terminate the relationship within sixty days of discovering the commingling or misbranding and requires that the notice of termination list the reason for termination.

Congress enacted the PMPA "to protect petroleum franchisees from arbitrary or discriminatory termination and nonrenewal of their franchises . . . [and] to equalize the perceived disparity of bargaining power between major oil companies and service station dealers and jobbers." JFC Investors, Ltd. v. Gulf Products Div. of BP Oil, Inc., 608 F. Supp. 1136, 1141 (W.D.N.C. 1985). Yet, recognizing that after a serious violation of a franchise agreement franchisers have a legitimate need to terminate or not renew a franchisee, Congress specified permissible grounds for termination and how to effectuate the termination.  Id.  Section 2802(c)(10) of the PMPA allows a franchiser such as Motiva to terminate a franchise if the franchisee engages in misbranding, commingling, or adulteration of petroleum products.  Notice of the termination must be given to the franchisee in the manner proscribed by 15 U.S.C. § 2804.  In certain circumstances, the statute allows fewer than ninety days notification before termination.   15 U.S.C. § 2804(a)(B)(1).   Commingling or misbranding are circumstances where a franchiser may give fewer than ninety days notice.  JFC Investors, 608 F. Supp. at 1142.

If a franchiser gives notice of fewer than ninety days, the notice of termination must be given within sixty days of when the franchiser had actual or constructive knowledge of the event that precipitated the termination. 15 U.S.C. § § 2804 (b)(2)(A), 2804 (b)(2)(C).  The statute contains the

sixty day limit to prevent franchisers from using stale events to coerce franchisees into unfair agreements. <u>Geib v. Amoco Oil Co.</u>, 29 F. 3d 1050, 1056 (6th Cir. 1994).

Motiva sent notice to RTP on September 26, 2006 that Motiva intended to terminate the franchise relationship effective October 31, 2006 pursuant to sections 2804 (b)(2)(A) and (C). Since Motiva provided fewer than ninety days notice of termination, the termination must be based on events which Motiva had actual or constructive knowledge of no more than sixty days before the notice. Sixty days before Motiva's letter of notification is July 26, 2006.

RTP presents two related arguments that the notice of termination was inadequate. First, RTP contends that Motiva had actual or constructive knowledge of the commingling before July 26, 2006; therefore, Motiva provided notice after the sixty day time limit. Second, RTP underscores that the commingling in June and early July was the stated reason for termination in the notice. Since Motiva now argues that termination was for other later-occurring commingling the notice is inadequate because it does not state the reason for termination. Succinctly put, RTP is arguing in the alternative, either the September 26, 2006 notice was late because it was based on the June and July commingling or if it was not late, then the notice failed to identify an appropriate reason for the termination. RTP's arguments are not supported by case law nor the intent of the statute.

### B. Precedent on Notification under the PMPA

Although there is plenty of case law on the PMPA, case law considering issues of the adequacy of notice under the PMPA is far more limited. There is one case in the Fourth Circuit which addresses the timing of termination in relation to the supplier's knowledge of a termination event. <u>Alexander v. Exxon Comp.</u>, 949 F. Supp. 1248 (M.D.N.C. 1996) (holding, without analysis, that notice delivered more than four months after franchisee received a felony conviction was within

the sixty day limit).

The Second and Sixth Circuits have both ruled on the issue of notice more clearly. In these Circuits the courts refused to find a notice deadline at the point of suspicion, but instead held that the time limit began after an investigation confirmed the franchiser's suspicions, especially if the event is continuous and has occurred within sixty days before notice. Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil, Co., 875 F.2d 359, 362 (2d Cir. 1998) (holding that, although a franchisee was indicted for criminal behavior, Shell did not have knowledge or constructive knowledge of wrong-doing until the franchisee told Shell he was embarrassed by his actions and was getting counseling, emphasizing that finding otherwise would encourage oil companies to terminate agreements because of suspicions, an effect completely at odds with the statute, and commending Shell for trying to ascertain the reality of the charges before terminating the contract); Geib v. Amoco Oil Co., 29 F. 3d 1050, 1056 (6th Cir. 1994) (holding that Amoco's delay was appropriate because the intent of the statute was to discourage termination at the first suspicion of wrong doing and noting that at least one incident of misreporting occurred within the statute's time limit); The Wisser Co., Inc. v. Mobil Oil Corp., 730 F.2d 54, 60 (2d Cir. 1984) (holding that knowledge or constructive knowledge of misbranding did not occur until a private investigator saw the misbranding, even though Mobil had suspicions of misbranding because of a drop in sales to a particular franchisee six months before hiring the private investigator, and concluding that, regardless of when knowledge occurred, each event of misbranding restarted the sixty day time limit); Amoco Oil Comp. v. D.Z. Enters. Inc., 607 F. Supp. 595, 602 (E.D.N.Y. 1985) (holding that notice was timely even though the franchisee admitted misbranding in a deposition and Amoco gave notice of termination 72 days after the deposition, because each act of misbranding constituted a

terminable event and the franchisee continued to misbrand after the deposition). All of these courts emphasized that not only were the franchisers within the statute's limits to wait on the outcome of an investigation, this practice followed the intent of the statute, which is to protect franchisees from arbitrary or unfair termination. Wisser, 730 F.2d at 60; Geib, 29 F.3d at 1056; D.Z. Enters., 607 F. Supp. at 602; Nassau Blvd., 875 F.2d at 362.

Here, a field representative with misgivings about RTP's behavior asked Eugene Goll to look into RTP in late May 2006. On June 1, 2006, Goll received an email from the analyst within Motiva who reviewed the credit card records of RTP, and this analyst said RTP was "DEFINITELY comingling [sic]." Goll then followed Shell's policy for investigating a wholesale marketer for possible commingling, which concluded on August 29, 2006 when Authentix emailed Goll to say that they found no operational issues within Motiva which may have caused RTP's repeated testing failures. Although Motiva had sound concerns and suspicions before August 29, Motiva did not know if there was some other cause, like Motiva's own operational problems, which might explain the test failures.

The intention of the "within sixty days" language is to protect franchisees from possible stale actions used to coerce behavior. Geib, 29 F. 3d at 1056. In 2004 when testing results showed possible commingling by RTP, Motiva gave RTP a second chance through the 2004 Settlement Agreement. This time Motiva went to substantial effort to verify that RTP was indeed misbranding gasoline. Finally, the misbranding was not an isolated incident; instead, the misbranding was a continuous course of conduct by RTP which violated RTP's agreements with Shell. Motiva had actual or constructive knowledge of the misbranding when it concluded its investigation on August 29, 2006. Therefore, notice of termination to RTP on September 26, 2006 was timely. Finding that

the notice was timely, the Court need not address RTP's argument that the notice was insufficient because it referenced commingling in June and July. Motiva did not violate the PMPA, and the Court denies RTP's request for summary judgment as to this issue.

## IV.  BREACH OF THE LANHAM ACT

### A. RTP violated the Lanham Act

In pertinent part, Section 32(1) of the Lanham Act provides that the holder of a valid trademark has a cause of action for infringement against any person who uses the trademark (1) without consent, (2) in connection with the sale of goods, (3) where such use is likely to cause confusion or deceive purchasers as to the source or the origin of the goods. 15 U.S.C. § 1114(1). Section 43(a) of the Lanham Act prohibits the "false designation of origin" of goods which is likely to cause confusion or mistake. 15 U.S.C. § 1125(a)(1).

In order to prevail under either a trademark infringement or unfair competition claim, a plaintiff must prove that "it has a valid, protectible [sic] trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995). Although no cases in the Fourth Circuit considered application of the Lanham Act to gasoline franchise agreements, the Fourth Circuit has found that leaving a trademark on a bagel store after termination of the franchise agreement is a violation of the Lanham Act because customers are likely to be confused. Motor City Bagels, L.L.C., v. Am. Bagel Co., 50 F. Supp. 2d 460, 485 (D. Md. 1999).

Similarly, gasoline sold under a trademark must be purchased from the holder of that trademark, because the trademark holder is the only entity which can designate its own product. Amoco Oil Co. v. D.Z. Enters. Inc., 607 F. Supp. 595, 599 (E.D.N.Y. 1985). It is a violation of

Section 32 of the Lanham Act to knowingly purchase gasoline from one company and then sell that gasoline to consumers from pumps designating the gas as coming from another company. Id. Selling gasoline under a trademark when the gasoline was not purchased from the holder of the trademark is appropriating the goodwill of the trademark holder and "palming-off" of goods, violating Section 43(a) of the Lanham Act for false designation of origin. Farkas v. Mobil Oil Corp., No. 85-1227-W, 1985 U.S. Dist. LEXIS 12221, at *8-9 (D. Mass. Dec. 30, 1985). A wholesaler who commingles or misbrands because of shortages in supply still acts willfully and is liable under the Lanham Act. Shell Oil Co. v. Avar Corp., No. 97 C 4479, 1998 U.S. Dist. LEXIS 8657, at *11 (N.D. Ill. June 5, 1998).

There is no dispute as to Motiva's ownership of the Shell trademarks and RTP admits that it sold non-Shell gas under the Shell trademark. Yet, RTP argues that in some situations it had Motiva's consent and in other situations the sales were not "willful" violations of the Act. RTP contends that at the end of August 2005 and September 2005 gas was in short supply because of hurricanes Katrina and Rita, and RTP believed Motiva consented to its suppliers selling non-Shell gas under the Shell brand during this time. RTP's evidence of this consent to sell non-Shell gas consists of deposition testimony from Thomas, the President of RTP, and testimony from Ty Gantt, the Vice President of RTP, who both said it was common for distributors to ignore commingling or misbranding in times of severe shortage. Both testified that they never received permission from Motiva to sell non-Shell gas under the Shell trademark, nor did they ever alert Motiva of a shortage issue.

RTP also argues that if it were to review all of Motiva's records of testing gas stations it would find other stations which failed testing because of the gas shortage in late summer 2005.

However, Motiva provided RTP with data related to test results in North and South Carolina for June 2005 through September 2006, the time during which RTP claims there were gasoline supply shortages. (Doc. No. 64 at 6). Those test results do not show any other supplier with multiple site failures like that of RTP.

Later Motiva provided evidence of testing for October 2006 through 2007. RTP argues that these results show two multi-site failures and alleges that this shows Motiva treated RTP differently. Motiva provided evidence that these two multi-site failures were dealt with in the same fashion as RTP.[1] Regardless, this Court is not convinced that actions taken by Motiva months after terminating RTP provide any evidence that Motiva treated RTP differently than others in the summer of 2006.[2]

RTP presents no evidence that Motiva gave its consent for RTP to sell non-Shell gasoline under the Shell trademark. Conversely, Motiva presents substantial evidence that RTP did not have consent to commingle or misbrand and that other Shell wholesalers in North and South Carolina were not commingling or misbranding even during the alleged gasoline shortage in 2005.

Next, RTP argues that Gantt, the Vice President of RTP, acted against Thomas' specific instructions when he ordered non-Shell gas, and that Gantt's actions are not willful actions of RTP. Both Gantt and Thomas gave deposition testimony that after the first time Motiva alleged RTP was misbranding, RTP signed the 2004 Settlement Agreement with Motiva, and Thomas instructed Gantt not to deliver non-Shell gas to the Shell stations. Under well settled principles of *respondeat*

_____

[1]Motiva's evidence showed two suppliers with multi-site failures which were investigated and further testing was completed at each site, like the investigation for RTP. After the second testing, each site had passing scores and the investigations were closed.

[2]RTP provided the Court with no evidence that a party is not liable under the Lanham Act because the party was not treated the same as another party.

*superior*, "[i]f the act of the employee was a means or method of doing that which he was employed to do, though the act be wrongful and unauthorized or even forbidden, the employer is liable for the resulting injury."  Wegner v. Delly-Land Delicatessen, Inc., 270 N.C. 62, 66 (N.C. 1967).  RTP employed Gantt to find gasoline and ship it to specific locations.  Gantt's actions were within his job duties.  Gantt testified that he knew he was buying non-Shell gas for Shell stations.  Gantt voluntarily and intentionally bought the gas and sold it under the incorrect brand name.  Regardless of whether Gantt's actions were authorized, authorized by acquiescence, or forbidden, RTP is liable for his willful actions.

It is undisputed that RTP commingled and misbranded Shell gasoline. RTP's explanations and excuses do not protect the company from the trademark laws.  RTP's willful sale of non-Shell gasoline at Shell stations without the consent of Motiva likely caused confusion to purchasers as to the origin of the goods in violation of both Section 31 and Section 43 of the Lanham Act, and summary judgment is appropriate.

### B.  Motiva is Entitled to RTP's Profits from Its Sales of Non Motiva-Brand Gasoline

Under the Lanham Act, a plaintiff who establishes violations under Section 43 is entitled to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action, subject to the principles of equity and subject to the provisions of Sections 29 and 32.  15 U.S.C. § 1117.  This Court recognizes that Motiva is entitled to RTP's profits from the misbranding sales, but full evidence must be presented on the topic before the Court will rule on what those profits might be.

## V. BREACH OF THE WHOLESALE MARKETER AGREEMENT AND THE 2004 SETTLEMENT AGREEMENT

Motiva contends that RTP's sale of commingled gasoline breached the WMA and the 2004 Settlement Agreement. Motiva seeks summary judgment on the fact that a breach occurred and asks that damages for the breach be determined later. The five-year WMA between Motiva and RTP began January 1, 2004 and should have ended in 2009. The WMA allowed RTP to use the Shell trademarks, trade name, and color schemes in connection with the resale of gasoline which RTP originally purchased from Motiva. RTP agreed to abide by all laws related to the sale of Shell-branded gasoline. Additionally, the WMA clearly stated the importance of maintaining Shell products and that RTP could not adulterate or commingle Shell-branded products. (Doc. No. 63-18 at 5). The 2004 Settlement Agreement was an amendment to the WMA entered into because of Motiva's allegations that RTP was commingling product. The 2004 Settlement Agreement goes to even greater lengths to emphasize the importance of unadulterated product and the possible ramifications for breach of this aspect of the contract.

In North Carolina, the elements of breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).[3] A

_____

[3]Although the parties do not address which jurisdiction governs the interpretation of the contract it appears that North Carolina, South Carolina, and Texas are the possible choices for jurisdiction. The contracts do not contain choice of law provisions.

> Because this action was filed in North Carolina, we look to that state's conflict of laws analysis to identify the law governing [the parties'] contract claim. Under North Carolina law, the principle of *lex loci contractus* applies to choice-of-law decisions in contract cases; therefore, we apply the law of the state where the last act essential to a meeting of the minds occurs.

Cole v. Champion Enters., 305 Fed. App'x. 122, 128 n.8 (4th Cir. 2008) (citing Walden v. Vaughn 579 S.E.2d 475, 477 (N.C. Ct. App. 2003)). RTP is headquartered in North Carolina and it appears that RTP signed the contracts while in North Carolina. Motiva is headquartered in Texas and may have signed contracts there or may have field representatives who signed the contracts in North or South Carolina. It is difficult to determine where the last act occurred, but both sides seem to cite North Carolina law more than any other jurisdiction. The possible distinction between the other jurisdictions and North Carolina law is that North Carolina does not

breach of contract is only actionable if a material breach occurs – one that "substantially defeat[s] the purpose of the agreement" or goes "to the very heart of the agreement," or can be "characterized as a substantial failure to perform." <u>Fletcher v. Fletcher</u>, 474 S.E.2d 802, 807-08 (N.C. Ct. App. 1996) (internal quotation marks omitted).

RTP does not contend that the WMA and the 2004 Settlement Agreements are invalid contracts. RTP's commingling of gasoline violates several clauses in both of these agreements. The purpose of these agreements was to allow the use of a trademark in exchange for the business of the wholesaler. RTP's use of the trademark while obtaining gasoline elsewhere is a material breach of the contracts which led to Motiva losing sales on a substantial quantity of gasoline.

RTP presents three ultimately unpersuasive arguments to establish that it did not breach the WMA or the 2004 Settlement Agreement. First, RTP argues that its actions did not breach the contracts "if such actions were permitted by Motiva." (Doc. No. 65 at 11). For the reasons discussed in Section IV.A. of this Order, the Court again finds there is no evidence of consent by Motiva.

Second, RTP contends that Section 18 of the WMA excuses the misbranding because performance was impossible due to the hurricanes in the summer of 2005. Motiva terminated the contracts in October 2006 because of commingling from the summer of 2006. The hurricanes Katrina and Rita happened a year or more before this commingling. At the time of termination, RTP was in breach of the agreement regardless of the earlier hurricanes. The exact date of the first breach is only relevant to determine damages; not whether a breach occurred.

---

require damage as an aspect of breach of contract. Since the Court finds that damage to Motiva occurred, it is inconsequential which jurisdictions' law the Court applies.

Third, RTP posits that there is no breach of contract unless Motiva seeks actual damages under the WMA and 2004 Settlement Agreement, not disgorgement of RTP's profits. Damages are not an element of breach of contract in North Carolina. <u>Poor v. Hill</u>, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). Furthermore, RTP's records indicate that it purchased thousands to millions of gallons of gasoline from non-Shell suppliers which were then sold under the Shell name. Damage to Motiva is clear; it is yet to be determined whether lost profits, disgorgement of RTP's profits, or some other measure will best compensate Motiva. Yet, Motiva only requested that the Court rule as to the liability in its summary judgment motion, not as to damages.

The WMA and the 2004 Settlement Agreement were binding contracts. RTP's practices of commingling and misbranding violated both contracts. The Court grants Motiva's request for summary judgment that RTP breached both the WMA and the 2004 Settlement Agreement. The questions of when the breach first occurred and how to calculate damages is not before the Court.

## VI. BREACH OF THE JOBBER INCENTIVE AGREEMENTS

Motiva advanced RTP certain amounts of money through incentive agreements and in return RTP agreed to purchase Shell gasoline over a certain period of time, usually ten years. These agreements were called Jobber Incentive Agreements and were voluntarily entered into by both parties. They are valid and enforceable contracts. All three agreements contain sections which state that if the agreement is terminated for lawful reasons RTP must repay the advanced money and provide a formula for calculating the repayments. Under the Jobber Agreements, RTP's breach of the WMA and 2004 Settlement Agreements is a lawful reason for Motiva to terminate all three Jobber Agreements. Finding that the Jobber Agreements were lawfully terminated by Motiva, RTP is liable

to Motiva under the Jobber Agreements. Using the formals provided in the Jobber Agreements, RTP is liable to Motiva for $187,994.08 (Doc. No. 63-15 at 7).

## VII. BREACH OF THE NORTH AND SOUTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

Each party claims the other violated the North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTP") and the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). Each statute is addressed below.

### A. The North Carolina Unfair and Deceptive Trade Practices Act

Under the North Carolina General Statutes section 75-1.1, a plaintiff must show that the defendant committed an unfair or deceptive act, that affected commerce, and proximately injured the plaintiff. Pleasant Valley Promenade v. Lechmere, Inc., 464 S.E.2d 47, 58 (N.C. Ct. App. 1995). North Carolina courts indicated that the words "unfair methods of competition," as used by the statute, encompass any conduct a court of equity would consider unjust. Harrington Mfg. Co. v. Powell Mfg. Co., 248 S.E.2d 739, 744, 746 (N.C. Ct. App. 1978). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (citations omitted).

#### 1. Motiva's Claim Against RTP

RTP's actions outlined above, which unmistakably show violations of the Lanham Act, provide conclusive support that RTP also violated the North Carolina UDTP Act. Trademark infringement and false designation of origin are deceptive and unfair acts; if a plaintiff proves a violation of the Lanham Act, which affected commerce, and injured plaintiff, plaintiff is entitled to summary judgment on claims brought under North Carolina's UDTP. Microsoft Corp. v. Computer

Serv. & Repair, Inc., 312 F. Supp. 2d 779, 785 (E.D.N.C. 2004). In Polo, the Fourth Circuit recognized that although many of the customers would not have purchased the far more expensive Polo clothing, the use of the trademark and the possible loss of sales constituted an injury which entitled Polo to damages under the North Carolina UDTP. Polo Fashions, 816 F.2d at 149. This case is similar to Microsoft where the customers may not have known they were receiving an inferior product, if the product was even inferior, but the customers wanted a Microsoft product and that is not what they received. The court found that "trademark infringement and false designation undercut [Microsoft's] goodwill and consumers' ability to distinguish among products. These events harm the plaintiff corporation." Microsoft Corp., 312 F. Supp. 2d at 785.

Had the RTP supplied-stations not held a Shell trademark, perhaps the motorist would have driven to one that did; regardless, this practice prevents consumers from distinguishing products to the detriment of Motiva. Although the damage to Motiva is difficult to determine, the improper use of its trademark and the loss of business injured Motiva. As outlined above, Motiva provides unrefuted evidence of RTP's violation of the Lanham Act and ensuing damage to Motiva, and therefore shows that RTP violated North Carolina's UDTP. Motiva's request for summary judgment as to its claim that RTP violated the North Carolina's UDTP Act is granted.

### 2. RTP's Claim Against Motiva

RTP presents several events during its relationship with Motiva which RTP claims were violations of the North Carolina UDTP Act. All of these incidents involve Larry McCarter, Shell's Marketing Representative. First, RTP states that when it wanted to sell one of its Shell-branded stations, McCarter demanded full payment on the contracts rather than allow RTP to substitute a new station for the old station. The substitution eventually occurred. Next, RTP says that on two

occasions McCarter threatened RTP with the loss of its rights under the WMA because of misuse of the Shell trademark. In one case, RTP stopped supplying a station with gasoline because of non-payment and the station owner refused to remove the Shell signs. McCarter warned RTP that it was RTP's responsibility and contractual obligation to make sure that stations were appropriately using the trademark, and failure to do so would lead to termination of RTP's WMA with Motiva. The second incident was similar. A station which RTP supplied was using old Shell trademarked signs rather than the appropriate marks. Again, McCarter warned RTP by letter that if RTP's customers continued to use improper Shell trademarks, Motiva would terminate the WMA. In both of these situations, Thomas answered that he asked the stations to remove the signs, but neither he nor his company, RTP, could make the station owners comply. Thomas argues that Motiva's written warnings of possible contract termination were inappropriate threats.

Yet, the main complaint by RTP in regards to the behavior of McCarter and Motiva surrounds the sale of an alternative fuel, E85. On July 29, 2005, Motiva told RTP that it could not sell E85 under any of the "Shell canopies." This restriction on the sale of alternative fuel triggers the Gasohol Competition Act which prohibits "unreasonable" limits on the sale of alternative fuels. 15 U.S.C. § 26(a)(2). RTP contends that the requirement that E85 be sold outside the canopy was a violation of the Act, and RTP contends that in the fall of 2005 McCarter confronted Thomas at a petroleum conference and accused him of improperly selling E85 under a Shell canopy. McCarter does not recall that interaction ever occurring. Motiva later reassessed the E85 situation and allowed gas stations to sell the product under the canopy if necessary.

Taking this evidence in a light most favorable to RTP, RTP has not presented facts which create a material question of fact regarding the claim that Motiva violated the North Carolina UDTP

Act.  It was neither unfair nor deceptive for Motiva to insist that RTP pay out their contract rather than substitute another gas station for the gas station which closed.  Regardless, Motiva eventually let RTP substitute the gas station.  Next, although Motiva may have treated RTP differently in requiring them to maintain appropriate Shell trademarks,[4] Motiva had the right to require RTP's customers to use appropriate signs, regardless of whether Motiva asked its other wholesale marketers to do the same.  Finally, requiring that E85 fuel be sold outside the Shell canopy was not unfair nor deceptive.  The contract with Motiva clearly states that non-Shell fuel cannot be sold under the Shell canopy because of customer confusion.  Although the E85 fuel is a special case because of the government's encouragement of alternative fuel sources, in July 2005 it was Motiva's company policy to require all other fuels to be sold outside the canopy.  It appears Motiva reevaluated this policy to provide some leeway for E85 fuel to be sold under the canopy.  None of these circumstances rise to the level of being unethical, unscrupulous, or causing deceit and therefore, none of these facts create a question as to a possible violation of North Carolina's UDTP.  The Court grants Motiva's request for summary judgment, dismissing RTP's counterclaim as to North Carolina's UDTP.

### B. South Carolina's Unfair Trade Practices Act

The South Carolina UTPA prohibits, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." S.C. Code Ann. § 39-5-20(a).  For a plaintiff to prevail under South Carolina's UTPA, the plaintiff must prove "(1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful

---

[4]The Court creates no finding of fact on whether RTP was or was not treated differently because the treatment was not unethical, unscrupulous, nor deceptive, even if other wholesalers were not treated the same way.

trade practice engaged in by the defendant had an adverse impact on the public interest." Havird Oil Co. v. Marathon Oil Co., 149 F.3d 283, 291 (4th Cir. 1998). Establishing that the act has "potential for repetition," shows an impact upon the public interest. Geftman v. Boat Owners Ass'n of the United States, No. 2:202-1461-18, 2003 U.S. Dist. LEXIS 24861 at *4 (D.S.C. 2003) (citing Haley Nursery Co., Inc. v. Forrest, 381 S.E.2d 906 (S.C. 1989)). Establishing that similar actions occurred in the past shows a likelihood of future occurrence absent some deterrence. Network Computing Servs. Corp. v. Cisco Sys., 152 Fed. App'x. 317, 321 (4th Cir. 2005). Further, confusing consumers about the source of goods they purchase, has an effect on the public interest. Global Prot. Corp. v. Halbersberg, 503 S.E.2d 483, 487 (S.C. Ct. App. 1998).

### 1. Motiva's Claim Against RTP

Having already established above that RTP's "palming-off" of non-Shell branded gasoline was unlawful, deceptive, and affected commerce, the Court now considers if these practices have an adverse impact upon the public interest. RTP commingled for months, illustrating that such behavior has a high potential for repetition. This alone meets South Carolina's requirements, but further, as the South Carolina Court of Appeals found in Global Protection, the public has a strong interest in believing the goods they purchase actually come from or are approved by the company whose name appears on the product. Global, 503 S.E.2d at 487. RTP's behavior impacts the public interest because the public has a strong interest in trusting that Shell gas actually came from Shell. RTP's actions of misbranding violate South Carolina's UTPA.

South Carolina requires that the deceptive practice cause actual ascertainable damage to the plaintiff. Harvird Oil, 149 F.3d at 291. The South Carolina Court of Appeals recognized that packaging a product to look nearly identical to a previous product on the market would most likely

divert sales, and this trademark infringement causes actual harm in lost sales. <u>Global Protection</u>, 503 S.E.2d at 487. Here, the stations were clearly marked as Shell stations. Some motorists prefer to purchase gasoline from specific gasoline suppliers. Undoubtedly some of the customers who bought gas at these stations would have passed by the stations to go to a Shell station had they known that they were not receiving Shell gasoline. RTP's deceptive actions affected commerce, impacted the public interest, and caused actual damage to Motiva. The Court grants Motiva's request for summary judgment that RTP violated South Carolina's UTPA.

### 2. RTP's Claim Against Motiva

RTP's claims under South Carolina's UTPA are the same as it brought forward under the North Carolina Act. For the reasons stated above, the Court grants Motiva's request for summary judgment, dismissing RTP's counterclaim as to South Carolina's UTPA.

## VIII. LIABILITY OF THOMAS UNDER HIS GUARANTY

RTP requests that this Court rule that Thomas is not liable to Motiva for Motiva's damage claims in this lawsuit under Thomas's personal guaranty. Under North Carolina contract law, a personal guaranty is interpreted according to the standard rules of contract construction. <u>O'Grady v. First Union Nat'l Bank</u>, 250 S.E.2d 587, 593 (N.C. 1978). A court must interpret the language of the contract in light of the parties' intent at the moment of the execution of the contract. <u>Carter v. Barker</u>, 617 S.E.2d 113 (N.C. Ct. App. 2005). The Supreme Court of North Carolina looks to five factors when considering the parties' intent: (1) the contract language; (2) the subject matter of the contract; (3) the end goal of the agreement; (4) the purpose sought; and (5) the situation of the parties at the time of contracting. <u>Peaseley v. Va. Iron Coal & Coke</u>, 194 S.E.2d 133, 142 (N.C. 1973). Ambiguities in contracts are construed against the party who authored the contract. <u>Smyth v. United</u>

States, 302 U.S. 329 (1937). In this circumstance, the most telling aspects of the Peaseley test are the contract language, the purpose of the agreement, and the situation of the parties at the time of contracting.

**A. The Contract Language**

The Guaranty states:

> Guarantor . . . guarantees prompt and full payment at maturity of all indebtedness heretofore or hereafter incurred by [RTP] to Shell for purchases of petroleum products, other merchandise or services, for rents, or on any other account (whether evidenced by open accounts, promissory notes, drafts, trade acceptances or otherwise), and all renewals, extensions and changes in form of any part or all of such indebtedness, and all costs of collecting the same.

(Doc. No. 62-4 at 1). Motiva argues that Thomas personally guaranteed (1) the amounts advanced to RTP under the Jobber Agreements; (2) the minimum purchase amounts under the WMA; and (3) damages for breach of any of the controlling contracts.

**1. Breach of Contract Damages**

The plain language of the Guaranty does not hold Thomas liable for breach of contract damages. The Guaranty holds Thomas liable for indebtedness "for purchases of petroleum products, other merchandise or services, for rents, or on any other account," not for damages arising out of breach of contract. Motiva argues that the damages for breach of contract are another account under the Guaranty. Unless a term is ambiguous, a court should use the plain meaning of an undefined term in a contract. Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp. 2d 785, 792 (E.D.Va. 2001). As defined by Black's Law Dictionary, an account is a "detailed statement of debits and credits between parties to a contract or fiduciary relationship" and "a reckoning of monetary dealings," as well as a "course of dealings or other relations for which records must be kept." Black's Law Dictionary 18

(8th ed. 2004). Money owed to Motiva for breach of contract is not an amount owing on an account.

### 2. The Jobber Agreements

The amount owing to Motiva under the Jobber Agreements is an account for which Thomas is liable. These agreements were a course of dealing for which Motiva kept detailed records. Under the specific language of the Guaranty, Thomas is liable for the amounts owing under the Jobber Agreements and, as stated in the Guaranty, for all costs of collecting the amounts owed under the Jobber Agreements.

### 3. Minimum Amounts under the WMA

The Guaranty also states that Thomas is liable for purchases of merchandise or services. Service is "the act of doing something useful for a person or company for a fee." Black's Law Dictionary 1399 (8th ed. 2004). Allowing RTP to use the Shell trademark was a service rendered to RTP. The purchase price of this service was the minium purchase amounts under the WMA. RTP purchased the right to use the Shell trademark each month through its obligation to buy minimum amounts of Shell-branded gasoline. Thomas is liable for the profit Shell would have realized had RTP bought the minimum amount of gas it was required to buy each month under the WMA as amended by the 2004 Settlement Agreement. Yet, the Guaranty only makes Thomas liable for mature indebtedness. These monthly minimums are not mature indebtedness until RTP uses the Shell trademark for the month; therefore, Thomas is not liable for future monthly minimums.

### B. Goal of the Guaranty

Although somewhat circular, the language of the Guaranty often helps determine the end goal of a contract. From the language of the Guaranty, the goal was to ensure payment for products and services sold by Motiva. Motiva did not want to provide RTP with goods and services without

24

Thomas personally guaranteeing those obligations. This is further support that the Guaranty obligates Thomas as to the Jobber Agreements and the minimum purchase requirements, but not as to breach of contract damages. The advanced money to RTP under the Jobber Agreements is an account that Motiva would want to ensure repayment of, and the use of the Shell trademark was a service purchased by RTP through its monthly minimums for which Motiva would want another party liable. The Guaranty was not an indemnification by Thomas to be liable for all actions of RTP and should not be treated as such.

### C. Situation of the Parties at the Time of Execution of the Contract

Motiva makes a strong argument that the situation of the parties at the time of contract shows Motiva's intent to bind Thomas for all amounts possible under the Guaranty. As Motiva underscores, RTP was a fairly unknown entity to Motiva and Motiva took a risk by entering into a business with RTP and Thomas. Yet, Thomas's situation at the time was one of far less bargaining power, fewer monetary resources, and he most likely desired to be personally liable for as little as possible. Motiva wrote the Guaranty and Motiva is a sophisticated billion dollar company. If Motiva wanted to hold Thomas liable for damages incurred due to RTP's breach of contract, Motiva could have included that in the agreement.

Damages for breach of contract are not an indebtedness for purchasing petroleum products, other merchandise or services, for rents, or an indebtedness on any other account. Neither the contract language, nor the goal of the Guaranty, nor the situation of the parties at the time of the contract show that Thomas is personally liable for the breach of contract damages under his Guaranty. The Court grants RTP's request for summary judgment that Thomas is not liable for contract damages under his Guaranty. The Court grants in part and denies in part Motiva's request that the Court find that

Thomas is liable for all obligations and indebtedness from the Motiva/RTP relationship. Thomas is obligated under his personal Guaranty for the amounts owing on the Jobber Agreements and for Motiva's profit from the required minimum monthly purchases for each month that RTP used the Shell trademark, but did not purchase the minimum amount. Therefore, the Court grants in part and denies in part Motiva's request that the Court hold Thomas liable for all obligations and indebtedness from the relationship between Motiva and RTP.

## IX. MOTION TO STRIKE

RTP argues that this Court should strike the declaration and accompanying exhibits submitted by an attorney for Motiva. RTP argues that the declaration is improper testimony by an attorney and that the attached records cannot be authenticated by Motiva's counsel. Both of these assertions are flawed.

### A. Improper Testimony

Motiva offered a declaration and accompanying exhibits in its Sur-Reply (Doc. No. 75) to RTP's Motion for Summary Judgment (Doc. No. 63). In her declaration, Motiva's attorney, Vaugh Finn ("Finn"), authenticates that Motiva received the attached documents from RTP during discovery, and she provides a chart which re-lists the information contained in the exhibits in a shorter, more manageable fashion. These documents highlight that RTP bought thousands of gallons of non-Shell branded gasoline between July 3, 2006 and August 26, 2006. RTP argues that because Finn is legal counsel for Motiva, her declaration is improper as she is both an advocate and a witness. Although the declaration summarizes the information contained in the produced documents, it does not provide or interpret that information in any way other than how the information originally came from RTP.

### B. Authentication

RTP contends that Finn cannot authenticate the documents because she does not have personal knowledge about RTP's record keeping. RTP never claims that these documents are not authentic, just that Motiva's counsel cannot authenticate them. In fact, RTP's President, Thomas, authenticated these documents during his deposition.

An attorney is an appropriate source to authenticate documents received in discovery. Commercial Data Servers, Inc. v. IBM, 262 F. Supp. 2d 50, 60 (S.D.N.Y. 2003); Evanston Ins. Co. v. Westchester Surplus Lines Ins. Co., 546 F. Supp. 2d 1134, 1139-40 (W.D. Wash. 2008). Although the Fourth Circuit has not ruled on this precise issue, the logic and holdings as to this issue in both Commercial Data and Evanston are well reasoned:

> It is disingenuous and wasteful for plaintiff to object that its own documents are not authenticated, and thus inadmissible at trial and on summary judgment. The appearance of these documents and the circumstances surrounding this motion - most importantly the fact that the plaintiff is in the best position to know if they are authentic and that they have never claimed that they are not - show that these are authentic documents.

Commercial Data, 262 F. Supp. at 60.

> [T]he proponent of the evidence need only make a prima facie showing of its authenticity. Importantly, documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent. An opposing party may not subsequently challenge an attorney's ability to authenticate documents attached to her declaration that were previously provided by the opposing party without objection as to their authenticity.

Evanston, 546 F. Supp. at 1139-40. The Court adopts the logic of the Commercial Data and Evanston courts. RTP would have raised authenticity concerns when it produced its documents if it had any. Further, RTP's President again authenticated these documents after production, during

his deposition.  These documents are fully authenticated and having an attorney for Motiva provide the declaration with the documents was appropriate.  The Court denies RTP's Motion to Strike.

## X.  CONCLUSION

The Court DENIES in part and GRANTS in part Defendants' Motion for Partial Summary Judgment (Doc. No. 61).  The Court GRANTS in part and DENIES in part Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 63) and the Court DENIES Defendants' Motion to Strike (Doc. No. 78).  The parties should be prepared to present all remaining aspects of this matter, including damages, at trial.


Signed: June 15, 2009


Robert J. Conrad, Jr.
Chief United States District Judge