UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
_____

| | | |
|---|---|---|
| SHELL TRADEMARK MANAGEMENT BV and MOTIVA ENTERPRISES, LLC, | ) ) ) | No. 3:07cv163-RJC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| RAY THOMAS PETROLEUM COMPANY, INC., | ) ) ) | |
| Defendant. | ) ) | |
| _____) | ) | |
| SHELL OIL COMPANY AND MOTIVA ENTERPRISES, LLC, | ) ) | No. 3:08cv400-RJC |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| L. RAY THOMAS, | ) ) | |
| Defendant. | ) ) | |

_____

## DEFENDANTS' TRIAL BRIEF
_____


## STATEMENT OF THE FACTS

*1. The business relationship of RTP with Shell.*

Ray Thomas Petroleum Company, Inc. ("RTP") is a North Carolina Corporation with its

principal place of business in Shelby, North Carolina. RTP employs approximately 130 persons and

is engaged in both the wholesale and retail sale of gasoline. Altogether, RTP supplies wholesale

1

gasoline and other petroleum products to 80 locations, which consist of both branded and unbranded independent retail customers and dealers, as well as to seven retail convenience stores and service stations owned or leased and operated by RTP. (L. Ray Thomas Dep. at p. 17)

RTP was originally started by its sole shareholder, Ray Thomas, and traces its beginnings to 1984 and from an operation supplying seven convenience stores to its current level of operation. (Thomas Dep. at p. 15). Currently, RTP, together with its affiliated company Franco Energy, LLC, a North Carolina LLC ("Franco"), provide several brands of gasoline and operates transport trucks to meet the requirements of its customers. (Thomas Dep. at p. 18). Gasoline and other petroleum products are picked up by RTP at least four different terminal locations. During the relevant period, RTP operated its transports to pickup either full tanker truck loads or half tanker truck loads (split loads) of branded and unbranded gasoline for delivery to its customers and its locations. The deliveries are sometimes split deliveries of different branded or unbranded fuels. In 2004, 2005 and 2006 RTP delivered branded fuels under a supply agreement with Shell to approximately 9-11 locations, other branded Phillips and CITGO fuels to approximately 52 locations, and approximately 50 unbranded locations through its independent retail customers and dealers in North and South Carolina and Eastern Tennessee.

During 2004 and 2005, dispatch was handled by a full-time dispatcher in the Shelby central office. Ray Thomas as majority stockholder and President of the company was involved primarily in sales and financial management of the company and was not involved in the day-to-day dispatch operations.

In 1993 Ray Thomas Petroleum sought out a brand relationship with Shell (Shell and Motiva are used interchangeably to refer to Motiva and its branded products), and sought to become a Shell

marketer. RTP committed to brand as Shell its best and largest volume locations, and accordingly at that time dedicated four of its top volume stores to be converted to Shell locations. The substantial financial investment of RTP in these locations, and later 5 to 6 additional locations thereby served the Shell brand during the relationship of the parties. The parties enjoyed a mutually beneficial relationship until 2004. During 1995 to 2005 RTP purchased over 70 million gallons of sales of Shell gasoline and netted Shell millions of dollars in profits.

After 1993 and until 2004, RTP enjoyed a good relationship with Shell through a succession of marketing representatives. Shell supported the operations of RTP by providing incentives, including bonuses and awards, given to RTP employees through the Shell marketing representatives. This practice by Shell continued until the assignment of Larry McCarter by Shell to be the marketing representative for RTP. RTP was also aware that Shell often extended price supports consisting of discounted pricing to other wholesale marketers through requests to the marketing representative where competitive conditions warranted requests for price concessions by Shell.

In 2004 RTP experienced a financial loss by non-payment of a large dealer account in Rock Hill, SC and the bankruptcy of another of its "sub-dealers" who operated multiple locations and carried substantial balances. The dealer in Rock Hill failed to pay outstanding amounts, which were never collected by RTP. The dealer with multiple retail locations in Shelby, NC filed for bankruptcy. Between these two dealers, in excess of $1,500,000.00 in accounts receivable were not collected by RTP. This, in turn, made operations difficult, and set in motion other repercussions, including the sale by RTP of valued Shell-branded locations on Harris Blvd. and Johnston Roads in Charlotte, NC to raise working capital. At the time of the sale, Shell's marketing representative, McCarter, demanded full payment of amounts claimed by Shell under the Statesville Road incentive contract,

or failing full payment by RTP McCarter for Shell demanded an immediate "rolling", that is the substitution of another location being branded to Shell to fulfill the commitment made in the early incentive agreement by RTP. (Thomas Dep. at page 81, and McCarter Dep.at page 135).

Because of the difficulties related to the precarious financial difficulties of obtaining a substitute location, and the inability of RTP to address the immediate repayment of the incentive amount, McCarter displayed frustration in the relationship, and McCarter suggested to Ray Thomas that "maybe he should no longer be a Shell marketer". McCarter admits this motivation in his deposition. (McCarter Dep. at page 141).

It was McCarter who in 2005 singled out Ray Thomas Petroleum for non-random testing by Authentix. Shell's employee, Eugene Goll, has admitted that the testing of RTP service Shell stations (on which the supply contract termination was based) was abnormal in that they were not conducted randomly, as were the tests at Shell's service stations supplied by other wholesalers, and this atypical testing was instigated at the request of McCarter. (Goll Dep. at page 81, 1.17-83, 1.5).

Further, the testing of the Ray Thomas Petroleum locations in 2006 was carried out by Authentix at McCarter's request at times when the supply of Shell gasoline was disrupted by the successive effects of hurricanes Katrina, Rita, Gustav and Ike. During 2005, and into the summer of 2006, the supplies of gasoline by Shell were substantially disrupted. Despite prior instructions from Ray Thomas to avoid co-mingling of gas, and his efforts to articulate company policy to avoid co-mingling, the dispatcher for RTP, Ty Gantt ("Gantt") believed that because of the severe disruptions of the supply and the non-availability of Shell product, that Shell, as well as the other major producers of gasoline, had waived the normal requirements for placing only branded gas at their locations. (Thomas Dep. at p. 45, 2. 24,25, 46.6.1-3; p 51 6.3-12, p. 52, 6.5-25, p. 53, 6.1-23,

p. 57, 6.4-25 and Gantt Dep. at p. 84-90). This was done at times when Shell could not supply even close to the minimum volumes of gasoline specified in the parties's supply agreement and allocations were less than 25% of normal. (Gantt Dep. at pp 88,90).

Admittedly, Gantt also co-mingled gasoline in large volumes at the "substituted" Shell location in Gaffney, SC. This location experienced unusually severe conditions of competition. At this location other competitive brands of RTP experienced significant losses from the outset of RTP's purchase of the location in Gaffney, SC, and re-branding at its expense to the Shell brand. Despite requests by Gantt and others at RTP, no price support by Shell could be obtained through McCarter even though RTP was aware had been granted to other nearby Shell marketers. Gantt apparently also purchased non-Shell gas at this location in order to minimize company losses and because of the lack of any offer of price assistance by Shell in keeping with its own and industry standards. This was without the approval of Ray Thomas and against his prior instructions.

## 2. RTP's net profits on the comingled gasoline.

Defendants' statement of facts as to net profits is incorporated below with its legal argument.

## 3. Shell's lack of excess gasoline and rationing of its supplies.

Relevant to the issue of Shell's right to recover post-termination damages is the extent to which Shell mitigated its damages. With respect to Shell's right to damages, the issue of the extent to which Shell took steps to mitigate its damages is central to its right to recover its damages to the extent its damages were mitigated as argued below. It is obviously necessary for the Court to review the facts pertaining to the extent of mitigation of its damages by Shell.

In addition to the issue of the extent of Shell's mitigation of its own damages, the wholesale marketing agreement existing between Ray Thomas and Shell at paragraphs 18 & 19 of page 9

excuses any requirement for RTP to make minimum purchases during periods of allocation by Shell. Obviously, in the first instance then the issue of allocations or "lifting controls" by Shell must be established to determine the periods of time for which Shell is entitled to assert as a basis for a claim that minimum volumes were not purchased by RTP. Said another way, Shell must establish the times supplies were not rationed and it had excess gasoline that went unsold.

Motiva acknowledges its continued shortages of supply. (Deposition of Layne Polocheck, the Supply and Logistical Manager for Retail Organizations for Shell). Polocheck acknowledged continuous lifting restrictions (or allocations imposed by Shell):

Q: If I understand you correctly, would it be fair to say that in the last two years Motiva and Sopus have imposed allocations more often than not on their wholesale customers?

A: I would say that we have implemented protective lifting limits on a consistent basis as a matter in practice of wanting to provide adequate supply for all customers. (Polocheck Dep., page 34, lines 6-13)

Polocheck explained in his deposition:

Q.      Wouldn't it be fair to say that under normal circumstances, generally there are no allocations of restrictions on your wholesalers?

A: I want to say that that has been an evolving process. And in our roles we find it at times a struggle to supply customers primarily because of customers' habits or issue; so, in more recent years we have enacted or implemented what I will call protective lifting limits that are in place every day, every week, that hopefully will prevent, say one customer or set of customers from, say stealing or pulling more supply than they normally do and having

other customers pay the price or having an impact of supply outage that was caused by the other customers' lifting habits. Specifically regarding the shortages, after hurricanes Gustav and Ike Polecheck acknowledges these shortages.

Q: Do you recall following hurricanes Gustav and Ike in 2008 that there were severe supply shortages in different parts of the country, including North Carolina?

A: I recall there being issues - these issues I was not involved with as I was handling a different geography.

Q: So, you don't remember any severe supply shortages after hurricanes Gustav and Ike, or you just didn't know there were problems in the eastern part of the US? Is that your answer?

A: I knew there were refinery impacts. I knew this would lead to supply shortfalls....
(Polocheck Dep. at page 83, lines 8-20).

### 4. *Financial condition of Ray Thomas Petroleum Company, Inc.*

Regarding the Court or Jury's need to examine the equitable circumstances pertaining to the disgorgement of profits issue as is argued below, the ability of RTP to pay a damage award is a relevant circumstance. The expected testimony and evidence summarized here will tend to show that RTP cannot meet a substantial award of damages, and a substantial award of damages will force the cessation of business by RTP.

Jack Woerner has performed services as a financial consultant at RTP for the last two years. Mr. Woerner has assisted RTP with efforts to secure working capital financing and to remain in business. Mr. Woerner has extensive experience in financial accounting, commercial lending and financial management of businesses. Mr. Woerner holds a mathematics degree from Bucknell

University and an MBA from Columbia University.  The testimony of Jack Woerner and Ray Thomas is expected to establish the following facts regarding the financial condition of RTP:

The company's wholesale distribution of gasoline and petroleum products exists in the commodity market with low margins for three-quarters of the company's business.  The past collection difficulties pertaining to the Rock Hill, SC dealer and the Shelby, NC dealer, as well as needs for working capital,  forced efforts by the company to sell locations, and further to refinance through asset-based loans, which are also repaid by the company on a monthly basis.  The company's financial commitments, together with current difficulties in collection of accounts, have in recent years caused RTP to have regular cash flow difficulties.  Increases in the price for petroleum and tightening credit availability have also contributed to a lack of sufficient cash flow to meet obligations.  The company periodically experiences insufficient cash flow to meet its current obligations, and is forced to draw on its lines of credit or secure other emergency lending sources to meet its day-to-day cash needs.

The recent price volatility and increased difficulties in collections from its rural western North Carolina customers, have placed further strain on the company's ability to meet its obligations and remain in business.  In an effort to control costs, the company has experienced layoffs of 3 employees in recent months from its central office staff.  Overall, from December, 2006 to December, 2008 the company has reduced payroll expense from 116 employees to 80 employees.  Approximately 150 persons remain employed by the company at the present time, with most of these persons being employed in Shelby, NC.

Mr. Woerner will testify regarding the 2007 and 2008 financial statements of the company.  While the 2008 financial statement reflects shareholders' equity of $2,224,875.00, a total of

$764,572.00 of the shareholders' equity account consists of the bad debt owed to the company by the Rock Hill dealer, which is now uncollectible and will be excluded from the shareholders' equity in 2009 financial statements.

The 2007 financial statement shows income from operations of $442,436.00. Included in this income is a one time gain from sale of property and equipment of $92,800.00. The net loss for 2007 was, therefore, the sum of $152,078.00. After excluding the one time gain on the sale of property, the actual loss for the company for 2007 was $244,800.00.

Turlington & Co., the company's CPA, recently completed the 2008 financial statement on the company. On the company's 2008 profit & loss statement, the income from operations is reflected as $100,590.00. Further income includes a one time gain on the sale of property and equipment of $309,540.00. The company's net loss to be reflected on its 2008 tax return will be $38,869.00. Excluding the one time gain on the sale of property and equipment, the company's actual loss in 2008 according to Mr. Woerner's expected testimony and the prepared financial statement would be $348,409.00.

Year to year losses from 2007 to 2008, therefore, have increased and net income has decreased in keeping with the operational difficulties described above.

A.      **An Award of Thomas Petroleum's Net Profits Is Subject to Equitable Considerations.**

Shell is seeking an award of the profits earned by Thomas Petroleum through the sale of non-Shell gasoline at the six Shell-branded service stations in question.[1]  Shell's claim is premised upon

---

[1]   Shell is seeking the award of Thomas Petroleum's profits under the Lanham Act and the North Carolina and South Carolina Unfair Trade Practices Acts. (Plaintiffs' Memorandum in Support of Motion for Summary Judgment as to Damages ["Plaintiffs' Memorandum"] at pp. 13-14.) Plaintiffs do not seek duplicative amounts, however. *Id.*

the assumption that an award of any such profits is a purely mathematical exercise.  However, it is well established that ". . . there is no automatic monetary award even where a plaintiff succeeds in proving infringement."  *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 668 (E.D. Mich. 2005).  The decision as to an award of Thomas Petroleum's profits is "subject to principles of equity."  *Id.* (*quoting Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968).  "Situations will exist where it would be unduly harsh to grant such recovery."  *Id.* at 668-69.[2]

This principle is illustrated by the Ninth Circuit's decision inn *Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426 (9th Cir. 1979).  There, the Court of Appeals affirmed the district court's decision not to award any of the trademark infringer's profits, stating:

> The award of profits under the statute is expressly made "subject to the principles of equity."  Section 1117 [of the Lanham Act]  "confers a wide scope of discretion upon the district judge in the fashioning of a remedy."  *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968).  Willful infringement may support an award of profits to the plaintiff, but does not require one.  390 F.2d at 120-24.  The district court's assessment of the equities, based on the costs Saxony had already borne and their likely deterrent effect, was not improper.

The Court of Appeals also noted that the litigation costs incurred by a defendant may be taken into account in deciding whether to award profits in a trademark infringement case:  "The district judge indicated, however, that even if there were profits he would not have awarded them to plaintiff.  Saxony, he said, had suffered enough in the costs of litigation and of modifying the packaging of product to deter further infringement."  605 F.2d at 429.

Similarly, in the present case, Thomas Petroleum will present evidence at trial that it has already incurred hundreds of thousands of dollars in rebranding costs for the six former Shell

---

[2]  In the *Audi AG* case, the court found that the infringement was willful.  The court also found, however, that the defendant did not make a profit from the infringing activity and further held an award of actual damages was not appropriate.  *Id*. at 669.

stations, as well as similar amount in litigation costs, plus it must repay Motiva $187, 994.08 under the Jobber Incentive Agreements because of the termination of the Wholesale Marketer Agreement. Further, even if it is determined that Thomas Petroleum earned profits from the sale of non-Shell gasoline at the six Shell stations, this Court is not required to award such profits, or to treble them. As stated in *Faberge*, the Court should consider whether an award of some or all of any such profits would be unduly harsh.

In this case, the award sought by Shell, even if it were not inflated due to the exclusion of costs that are indisputably deductible, would put Thomas Petroleum out of business.[3] Thomas Petroleum will, therefore, present evidence at trial concerning the impact of any additional monetary award on the continued viability of the company and on its more than 120 employees.

Thomas Petroleum's entitlement to present evidence at trial on the equitable considerations pertaining to any award in this case is further illustrated by the case of *National Dryer Manufacturing Corp. v. The National Drying Machinery Co.*, 136 F. Supp. 886, 887 (E.D. Pa. 1955), in which the court granted injunctive relief, but declined to award infringer's profits, stating in part:

> The Lanham Act, 15 U.S.C.A. § 1117, provides that the right to recover profits against a trademark infringer shall be "subject to principles of equity." It seems to be definitely settled since *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S. Ct. 1136, 91 L. Ed. 1386, that an accounting for profits does not automatically follow a judgment of infringement. The "principles of equity" give the Court a very wide discretion and, as appears from the opinion in the case cited, the Court may base its discretion upon a wide range of considerations. . . .

The above principles were applied by the Fourth Circuit in *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991). In that case, Commercial Petroleum admitted that it

---

[3] While the Court has substantial discretion in determining an equitable amount, if any, to be awarded, the award may not constitute a penalty. 15 U.S.C. § 1117(a).

had sold "thousands of gallons" of non-Shell bulk lubricants under Shell's trademarks. *Shell Oil Co. v. Commercial Petroleum, Inc.*, 733 F. Supp. 40, 45 (W.D.N.C. 1989). Shell sued Commercial Petroleum under the Lanham Act and under N.C.G.S. 75-1.1, seeking injunctive relief, damages, disgorgement of Commercial Petroleum's profits on the sale of bulk lubricants under Shell's trademarks, treble damages and attorneys' fees.

After a bench trial, Judge Woodrow W. Jones found that Commercial Petroleum had infringed Shell's trademarks and that Shell was entitled to injunctive relief. However, Judge Jones further held that "[t]he evidence does not show any damages suffered by Shell and none will be assessed." 733 F. Supp. at 45. Judge Jones also refused to award any attorneys' fees to Shell, *Id.*, or to require any disgorgement of profits by Commercial Petroleum.

**B.    Subject to Principles of Equity, the Relevant Profits to Be Determined at Trial Are Thomas Petroleum's "Net" Profits, Not Its "Gross" Profits.**

Shell has the burden of proving the revenues received by Thomas Petroleum through the sale of the non-Shell gasoline. Thomas Petroleum has the burden of proving the deductible costs attributable to such sales. This evidentiary process is intended to yield the net profits, if any, earned by Thomas Petroleum on such sales.

The amount of net profits, if any, to be awarded to Shell at trial may be determined either by the trial judge or at the direction of the trial judge. A court may, for example, permit the jury to make this determination. In *Christopher Phelps & Associates, LLC v. Simonini Builders, Inc.*, 492 F.3d 532, 535 (4th Cir. 2007), a copyright infringement case tried before this Court, Judge Graham C. Mullen permitted the jury to determine both damages and the amount of profits to be disgorged. In the present case, the jury will be determining the amount of damages, if any, to be awarded to

Motiva for alleged future lost profits. Thomas Petroleum submits that it would be appropriate for the jury to also determine the amount of net profits earned by Thomas Petroleum from the sale of non-Shell gasoline at the six Shell service stations.

**C.     There Is a Dispute of Fact as to the Amount of Profits Earned by Thomas Petroleum on the Sale of Non-Shell Gasoline.**

There is a genuine dispute as to the amount of net profits, if any, earned by Thomas Petroleum on sales of non-Shell gasoline at the six Shell stations in 2005 and 2006.

Attached to Defendants' Response to the Plaintiffs' Motion for Summary Judgment as Exhibit 1 is the Affidavit of Jack Woerner, Thomas Petroleum's financial consultant. Mr. Woerner calculated the net profits earned by Thomas Petroleum on sales of non-Shell gasoline at the six Shell-branded stations in 2005 and 2006, and he explains how he did so in his Affidavit.

As Mr. Woerner states in his Affidavit, the volume of Shell and non-Shell gasoline sold through the six Shell-branded stations can be determined. (Woerner Affidavit at ¶ 6.) However, Thomas Petroleum's business records do not distinguish between revenues attributable to sales of Shell gasoline and those attributable sales of non-Shell gasoline. (*Id.*) Therefore, Mr. Woerner estimated those revenues using the ratios based upon the respective volumes of Shell and non-Shell sold at the stations. (Woerner Affidavit at ¶¶ 7-9 and Schedules A and B.) Those revenue estimates were accepted by Shell in the instant Motion. (Plaintiffs' Memorandum at p. 3.)

Similarly, Thomas Petroleum's business records do not identify costs attributable to purchases of Shell gasoline and non-Shell gasoline that was sold through the stations. (Woerner Affidavit at ¶ 6.) Mr. Woerner used the same ratios based upon the respective volumes of Shell and non-Shell gasoline to estimate the cost of sales of Shell and non-Shell gasoline. (Woerner Affidavit

at ¶¶ 7-11 and Schedules A-D.)  Mr. Woerner's estimates of the cost of the non-Shell gasoline sold

through the six outlets were also accepted by Shell in the motion. (Plaintiffs' Memorandum at p. 3.)

Although Shell agrees with Mr. Woerner's methodology in estimating revenues from the sale

of non-Shell gasoline and in estimating the cost of the non-Shell gasoline sold, it does not agree with

Mr. Woerner's use of sales ratios to estimate the overhead costs attributable to the sales of the non-

Shell gasoline, even though that methodology is consistent with Mr. Woerner's methodology in

estimating the revenues received from sales of non-Shell gasoline and the cost of such sales.

(Woerner Affidavit at ¶ 6.)  By using sales ratios at each station to arrive at a reasonable allocation

of overhead and operating costs attributable to the sales of non-Shell gasoline, Mr. Woerner

calculated the following net profits earned by Thomas Petroleum on sales of non-Shell gasoline at

each of the six stations in question during 2005 and 2006:

Gasland #1

2005 Net Profits:     $786.00
2006 Net Profits:     $2,314.00

Gasland #7

2005 Net Profits:     $2,499.00
2006 Net Profits:     ($1,153.00)

Gasland #9
2005 Net Profits:     ($18,641.00)
2006 Net Profits:     ($84,418.00)

Community Mart #1
2005 Net Profits:     $1,121.00
2006 Net Profits:     $822.00

Red Rocket
2005 Net Profits:     $3,519,00
2006 Net Profits:     $3,789.00

14

<u>Soda Shoppe</u>
2005 Net Profits:      $116.00
2006 Net Profits:      $305.00


<u>Total</u>
2005 Net Profits:      ($15,356.00)
2006 Net Profits:      ($83,257.00)

(Woerner Affidavit at ¶¶ 13-14 and Schedule G.)

More importantly, Shell's position on this issue is not supported by case law. As stated in

*Wolfe v. National Lead Company*, 156 F. Supp. 883, 888 (N.D. Cal. 1957):

> Once the injured party has sustained his burden of proving total sales of the infringing article, the infringer has the burden of proving all costs. Lanham Trade-Mark Act, Sec. 35, 60 Stat. 439 (1946), 15 U.S.C.A. § 1117 (1952); *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 1942, 316 U.S. 203, 62 S. Ct. 1022, 86 L. Ed. 1381. And ***it is the general rule that where the infringer's books do not allocate costs between the infringing article and other goods, nor permit such allocation, the sales ratio method is properly used.*** *Duro Co. of Ohio v. Duro Co. of New Jersey*, 3 Cir., 1932, 56 F.2d 313, 315-316.

(Emphasis added.)

It is well established that overhead costs are properly deductible in accounting for profits in

an infringement case. In *International Consulting Services, Ltd. V. Cheap Tickets, Inc.*, 2007 U.S.

Dist. LEXIS 71689 (E.D.N.Y. 2007) the infringing company (ICS) introduced into evidence its

federal income tax returns for years 2001-2005 to show its deductible costs. ICS asked the court to

deduct: "its overhead, operating expenses, federal taxes, advertising costs, and the costs of litigating

the instant case and the bankruptcy proceeding." *Id.* at pp. *8-*9. The court, over Cheap Tickets'

objection, allowed ICS's tax returns to be used to meet its burden of demonstrating its deductible

expenses. *Id.* The court ruled that all of ICS's overhead, cost and expense items in the tax returns

should be deducted from its revenues, except for two items, credit card expenses and legal fees. *Id.*[4]

---

[4] The court noted that ICS's principals admitted that they regularly used the company's credit cards for both business and personal expenses. *Id.* at p. *13.

The allocation of overhead costs based upon the percentage of sales revenues from infringing and non-infringing activity, as Mr. Woerner did, was specifically endorsed in *Hair Associates, Inc. v. National Hair Replacement Services, Inc.*, 987 F. Supp. 569 (W.D. Mich. 1997). In that case, the company's records did not permit an allocation of expenses between the infringing and non-infringing activities of the business. Accordingly, both parties relied upon revenues and costs as shown in the business tax returns. The revenues from the non-infringing activity were deducted from the overall business revenues, and the percentage of the remaining revenues (from the infringing activity) was used to allocate overhead costs in arriving at a calculation of net profits.[5]

Mr. Woerner testified at his deposition that Thomas Petroleum's "accounting records do not differentiate" between overhead costs directly related to sales of Shell and non-Shell gasoline at the six stations. (Plaintiffs' Memorandum at pp. 4-5.) However, he also testified that his method of allocating overhead was a reasonable method for doing so. (Woerner Dep. at pp. 84, l. 1 – p. 85, l. 3.) Of course, Mr. Woerner's methodology is supported by relevant case law.

However, even if Mr. Woerner had not determined Thomas Petroleum's overhead expenses in the sale of non-Shell gasoline, this Court should still make an equitable determination, based upon evidence presented at trial, of an appropriate amount of overhead expense to be deducted. In *Hospitality International, Inc. v. Mahtani*, 1998 U.S. Dist. LEXIS 16445 (M.D.N.C. 1998) (Exhibit

Note also that the court approved the use of percentages in calculating ICS's net profits: "All figures for 2004 represent 27% of the amounts reported by plaintiff in ICS' 2004 tax return, as the infringing conduct during that year ceased on April 9, 2004." *Id.* at Appendix 1 (footnote).

[5]

The court adjusted one item of deductible expenses in a different manner from using sales percentages. It allowed a deduction of one-half of the owner's compensation, finding that it was appropriate to allocate half to the non-infringing activity and half to the infringing activity of the company for purposes of arriving at the net profits from the infringing activity. 987 F. Supp. at 595-96.

1 to Plaintiffs' Memorandum), the court held that 25 percent of revenues was an appropriate amount to deduct for operating expenses, stating: "However, even though Mahtani did not prove his expenses, Mahtani surely had some expenses. It therefore seems unreasonable to award all sales as profits even though the Lanham Act permits that result." *Id.* at p. *33. Shell's assertion that Thomas Petroleum should receive no deduction for its overhead costs is not only an incorrect statement of applicable precedent, but it would also lead to a grossly inequitable result in this case.

I. **MOTIVA'S CLAIM FOR LOST FUTURE PROFITS MUST BE DETERMINED BY THE JURY.**

    A. **Motiva Must Prove at Trial that It Took Reasonable Steps to Mitigate Its Damages and That It Was a "Lost Volume Seller."**

It is well-established that a seller of goods has a duty to mitigate its damages where a purchaser breaches a contract of sale. *E.g.*, *Collins Entertainment Corp. v. Coats and Coats Rental Amusement*, 368 S.C. 410, 415, 629 S.E.2d 635, 638 (SC Sup. Ct. 2006). As explained below, as part of Motiva's burden of proving that it took reasonable steps to mitigate its damages, it must prove that it was a "lost volume seller" during the period of time from September 26, 2006 through December 31, 2008.

There were four terminals[6] (the "Terminals") from which Thomas Petroleum obtained Shell-branded gasoline under its Wholesale Marketer Agreement ("WMA") with Motiva. Motiva sold all of the gasoline that it had at the Terminals during the period that it claims it lost profits. (Polocheck Dep. at pp. 91, l. 21 – 92, l. 7) [copy attached to accompanying Affidavit of Richard L. Robertson].)

The traditional measure of damages in a case involving a breach of contract for the sale of goods is the difference between the market price at the time and place of tender and the unpaid

---

[6] Thomas Petroleum pulled Shell gasoline from two Motiva terminals in Charlotte, one in Greensboro, and one in Spartanburg.

contract price.  *See* N.C.G.S. § 25-2-708(1).  Because Motiva sold all of the gasoline that it had

available for sale at the Terminals, to claim lost profits Motiva must prove at trial that it had "excess

capacity" and, therefore, was unable to sell all of the gasoline that it had available for sale during the

relevant time period, *i.e.*, that it was a "lost volume seller."  *See Bill's Coal Company, Inc. v. William

D. Patch*, 887 F.2d 242, 245 (10th Cir. 1989) ("Sellers have the burden of proving that they are lost

volume sellers and thus fall under [UCC] section 2-708(2). . . .  [I]t is a decision dictated by the

underlying facts and thus ultimately a question of fact . . .  Evidence presented at trial indicated that

sellers did not have the production capacity to perform purchaser's contract as well as to sell to other

potential purchasers."); *Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 726 n.6 (Maine Sup.

Ct. 1983) (Court held that seller did not take reasonable affirmative steps to keep its losses to a

minimum and also that it was not a lost volume seller.  "Stated generally, the concept of lost-volume

sales posits that a seller of goods who conducts a resale following a breach will not be 'made whole'

if only allowed to recover the difference between the contract price and the resale price when the

resale is made to a second customer, at the expense of a second sale.  **The concept presupposes a**

**situation in which supply outstrips demand** . . . ."  [emphasis added].)

Motiva has the burden of proving to a jury that it was not able to sell all of the gasoline that

it had available for sale during the relevant time period**.**  If Motiva cannot prove this, and Thomas

Petroleum submits that it cannot, then the jury will rightfully conclude that Motiva, because it did

sell all of the gasoline that it had available at the Terminals, is seeking a windfall of double profits

on such sales.

**B.** **During the Relevant Period of Time, Motiva Consistently Imposed Allocation Limits to Restrict Purchases by Its Customers at the Terminals Because It Did Not Have Excess Supplies of Gasoline.**

Layne Polocheck, who has served as the Supply and Logistics Manager for Motiva and also for Shell Oil Products – US, testified that there were multiple periods of short supply during the period of time when Motiva is claiming lost future profits. (Polocheck Dep. at pp. 23, l. 24 - 24, l. 7.) During these shortage periods, Motiva had "a struggle to supply customers," causing it to implement allocation limits on its customers on a "consistent basis." (Polocheck Dep. at p. 33, l. 16 – 34, l. 19.)

Although it is Motiva's goal to sell gasoline, Motiva consistently placed allocation limits on its customers because supply was "a little tighter than we would like to have it." (Polocheck Dep. at p. 86, ll. 1 – 14; p. 31, ll. 7 – 19; and p. 34, ll. 10 - 13.) The allocation limits were imposed because of a concern that sufficient product would not have been available if one customer purchased more than 100 percent of its normal volume. (Polocheck Dep. at pp. 32, l. 18 – 33, l. 15.)

Plaintiffs' expert, Jeffry Rubin, confirmed Mr. Polocheck's testimony about the reasons for the imposition of allocation limits by Motiva. He stated: "Typically, we put customers on allocations when their supply is less than sufficient for the area. And so you spread the customer base so that they can get a fair amount." (Transcript of Deposition of Jeffrey A. Rubin ["Rubin Dep."] at p. 38, ll. 16-19 [copy attached to accompanying Affidavit of Richard L. Robertson].) Ray Thomas will also testify at trial to the obvious: Motiva, like other refiners, does not limit the amount of gasoline that its wholesale customers may purchase when there is excess supply available – its goal is to sell gasoline. (Polocheck Dep. at p. 86, ll. 1 – 14.)

Section 19 of the WMA deals specifically with Motiva's right to restrict purchases by its customers through the use of "allocations."  It may do so only where it "does not have sufficient supplies" of gasoline for its customers:

> **ALLOCATION.**  If Seller, for any reason, ***does not have sufficient supplies of the Products to supply its customers***, then during any period of short supply Seller may restrict deliveries of the Products to Buyer without liability and may allocate Seller's supply of the Products among its customers and classes of customers which in Seller's judgment is fair and reasonable under the circumstances.  After cessation of any period of short supply, Buyer and Seller shall promptly resume deliveries and receipts of the Products but shall ***not be obligated to make up any deliveries or receipts not made because of such period of short supply***.

(Emphasis added.)

Larry McCarter, a Wholesale Area Manager for Motiva, states in his Declaration that there were "occasional" supply "disruptions" at the Terminals during the relevant time period.  (McCarter Declaration at ¶¶ 7-9 [submitted contemporaneously with Plaintiffs' Motion].)  However, supply disruptions are different from supply restrictions that are placed upon customers due to a lack of excess supply.  The question for the jury is whether Motiva had excess supply.

Mr. McCarter also states that Motiva "would have been able to obtain more than sufficient amounts of gasoline" during the relevant time period.  (McCarter Declaration at ¶ 10.)  However, this statement again misses the point.  The issue is not whether Motiva might conceivably have been able to obtain excess gasoline; it is whether Motiva did in fact have excess gasoline available for its customers during the relevant time period.  For this reason as well, Mr. McCarter's Declaration provides no evidence that Motiva had "excess supply" and, therefore, was a "lost volume seller" at all times between September 26, 2006 and December 31, 2008.

More importantly, both Mr. Polocheck and Mr. Rubin disagree with Mr. McCarter's speculation about what Motiva might have done to eliminate its lack of excess supply. Mr. Polocheck testified that Motiva's practice has been to impose allocation limits on its customers instead of obtaining additional gasoline from other sources that would allow its customers to purchase on an unrestricted basis. (Polocheck Dep. at p. 37, ll. 3 – 20.) Mr. Rubin testified that Motiva only places allocation limits on its customers where it has not been able to obtain from other sources adequate supplies of gasoline to meet demand. (Rubin Dep. at p. 41, ll. 1 – 10.)

Motiva may not recover any alleged lost future profits during periods when allocation limits were in effect at the Terminals. Pursuant to Section 19 of the WMA, Motiva was contractually authorized to impose such limits only during periods of "short supply." Because there was no excess supply during periods when allocation limits were in place, Motiva cannot claim to be a "lost volume seller" during those periods.

Furthermore, Section 19 of the WMA also provides that Thomas Petroleum is not "obligated to make up any deliveries or receipts not made because of such period of short supply." In this regard, even Mr. McCarter concedes that there were periods of supply disruptions and shortages during 2007 and 2008. While there is a factual dispute as to the exact periods of time when Motiva did not have excess supply available, there is no dispute that there were such periods and that the identification of them is a necessary element of proof for Motiva's claim for future lost profits.

In sum, Motiva has failed to carry its burden of proving that it was a "lost volume seller" during the complete period of time between September 26, 2006 and December 31, 2008.

## C.  Thomas Petroleum Purchased More Shell Gasoline in 2006 than Motiva Used in its Damages Calculation.

Jeffrey Rubin, a Shell employee, is the expert designated by Plaintiffs to testify as to the lost future profits claimed by Motiva.  He based his calculations on the minimum volume amounts specified in Section 2(a) of the WMA:

| | |
|---|---|
| January 1, 2004 to December 31, 2004 | 3.6 million gallons |
| January 1, 2005 to December 31, 2005 | 3.8 million gallons |
| January 1, 2006 to December 31, 2006 | 4.0 million gallons |
| January 1, 2007 to December 31, 2007 | 4.2 million gallons |
| January 1, 2008 to December 31, 2008 | 4.4 million gallons |

(Rubin Declaration at ¶ 7 [submitted contemporaneously with Plaintiffs' Motion].)

With respect to Mr. Rubin's calculation of the lost profit damages claimed by Motiva for 2006, he testified that the lost profits claimed by Motiva are only for Thomas Petroleum's shortfall in purchases of Shell gasoline below the minimum of four million gallons in that calendar year.  (Rubin Dep. at pp. 141, l. 20 – 142, l. 4.)

According to Mr. Rubin, he understood that Thomas Petroleum purchased a total of only 2,361,465 gallons of Shell gasoline in 2006.  (Rubin Dep. at p. 140, ll. 1 – 16.)  Thus, he calculated lost profit damages in 2006 based upon a shortfall that year of 1,638,535 gallons.

Mr. Rubin's number is incorrect.  Thomas Petroleum actually purchased 3.95 million gallons of Shell gasoline in calendar year 2006.  (Woerner Declaration at ¶ 15.)

Thus, at the very least, there is a dispute of material fact as to the volume of Shell gasoline purchased by Thomas Petroleum in 2006 and, therefore, a dispute as to the amount of future lost profits that should have been calculated under Mr. Rubin's methodology.[7]

---

[7]  Motiva is claiming lost profits of $46,672 for the alleged shortfall in 2006.  (*See* Rubin Dep. at pp. 168, l. 19 – 169, l. 10.)

**D.    Mr. Rubin Did Not Take into Account Periods When Motiva Had No Excess Supply of Gasoline.**

Mr. Rubin also failed to take into account the periods of time during 2006, 2007 and 2008 when Motiva did not have excess supply.  Instead, for purposes of his calculations of the alleged lost profits of Motiva, Mr. Rubin assumed that Motiva would have had excess supply available every day from September 26, 2006 through December 31, 2008.  (Rubin Dep. at pp. 145, l. 8 – 146, l. 15.)[8] As explained earlier, this assumption was incorrect and greatly inflated the amount of damages calculated by Mr. Rubin.

For example, there was only a shortfall of 500,000 gallons of gasoline for the 2006 calendar year.  As a purported lost volume seller, Motiva has the burden of proving the periods of time when it actually did have excess supplies of gasoline available for its customers at the Terminals.  If, as Mr. Polocheck testified, there were periods of time when allocation limits were in effect, Thomas Petroleum's minimum purchase requirement for 2006 will be adjusted downward because those were those periods when Motiva did not have excess supplies of gasoline available at the Terminals.  Once that adjustment is made, the jury will probably find that Thomas Petroleum met its minimum purchase requirement for that year.

In this regard, Mr. Rubin incorrectly assumed that, even if there were times when Motiva did not have excess supplies of gasoline available, Thomas Petroleum would have been required to make up any shortfalls at other times, if any, that Motiva may have had excess supplies available.  (Rubin Dep. at p. 146, ll. 3 – 15.)  However, Section 19 of the WMA plainly states that Thomas Petroleum

---

[8]  Mr. Rubin testified that he did not take Section 19 of the WMA into account in his calculations of alleged lost profits, presumably because of his assumption that there were no periods when Motiva did not have excess supply at the Terminals.  (Rubin Dep. at p. 89, ll. 6 – 7.)

would not have had to have made up any shortfalls that occurred during any periods of time when allocation limits were in place at the Terminals.[9]

### E. Mr. Rubin Did Not Take into Account All of Thomas Petroleum's Purchases of Shell Gasoline During the Time When the WMA Was In Effect.

As shown above, Section 2(a) of the WMA required Thomas Petroleum to purchase a minimum of 20 million gallons of Shell gasoline from Motiva during the five-year contract term (subject to downward adjustment for periods when allocation limits were in effect).

During the period from January 1, 2004 through September 26, 2006, Thomas Petroleum purchased a total of 15.69 million gallons of Shell gasoline from Motiva.  (Woerner Aff. at ¶ 15.) Even if no adjustments were made for periods of time when allocations were in effect, this would result in a shortfall of 4.31 million gallons.  However, Mr. Rubin calculated Motiva's lost profits based upon an alleged shortfall of 10,238,535 gallons (Rubin Declaration at ¶¶ 9-10), more than twice the actual amount of the shortfall.  He did this by ignoring the excess purchases by Thomas Petroleum (over its annual minimum amounts) during the period of time from January 1, 2004 through September 26, 2006 (Rubin Dep. at pp. 142, l. 10 – 143, l. 12), and by not adjusting the annual minimum requirements to take into account periods when allocation limits were placed by Motiva on its customers.

## II. PLAINTIFFS' CLAIMS FOR ATTORNEYS' FEES AND COSTS ARE PREMATURE

Plaintiffs also make a claim for unspecified attorneys fees and other costs in the Motion. (Plaintiffs' Memorandum at pp. 7-9 and 12.)  Defendants submit that these claims are premature.

---

[9]   Mr. Rubin testified that his calculation of alleged lost profits was based upon his assumption that the WMA required Thomas Petroleum to purchase gasoline on a ratable basis, *i.e.*, in approximately equal quantities each day, week and month.  (Rubin Dep. at pp. 83, l. 8 – 84, l. 2.)

They should be decided by the Court in the normal course following the trial, at which time the Court and the parties will have available all relevant evidence pertaining to these issues.

## III.    CONCLUSION

For the reasons stated above and those to be established at trial, the Defendants Ray Thomas Petroleum Company, Inc. and L. Ray Thomas respectfully prays that the Plaintiffs have and recover nothing of the Defendants in this action and that the claims of the Plaintiffs against the Defendants be dismissed with prejudice.

Respectfully submitted, this the 6th day of July, 2009.


   */s/ Richard L. Robertson*                            */s/ William L. Taylor*
Richard L. Robertson                        William L. Taylor
State Bar No. 8000                          State Bar No. 5854
Richard L. Robertson & Associates, P.A.     Taylor & Powell, LLC
2730 East W.T. Harris Blvd., Suite 101      1800 Diagonal Road, Suite 600
Charlotte, NC 28213-4108                    Alexandria, VA 22314
Telephone:  (704) 597-5774                  Telephone: (703) 836-9405
Facsimile:  (704) 599-5603                  Facsimile: (703) 647-6563
rlrobertson@rlrobertson.com                 williamltaylor@live.com

*Attorneys for the Defendants*

## CERTIFICATE OF SERVICE

       I hereby certify that I have this day served a copy of the foregoing *Defendants' Trial Brief* on the Plaintiffs and other parties in the foregoing civil action via electronic transmission and/or the United States Mail, first class postage prepaid, addressed as follows:

       Shirley L. Fulton
       Nancy E. Walker
       Tin Fulton Walker & Owen
       *Attorneys for Plaintiff*
       301 East Park Avenue
       Charlotte, NC 28203
       Telephone:  (704) 338-1220
       Facsimile: (704) 338-1312
       Email: sfulton@tinfulton.com
              nwalker@tinfulton.com

       Paul D. Sanson
       Vaughan Finn
       Laurie A. Sullivan
       Shipman & Goodwin LLP
       *Attorneys for Plaintiff*
       One Constitution Plaza
       Hartford, CT 06103-1919
       Telephone: (860) 251-5000
       Facsimile: (860) 251-5219
       Email: psanson@goodwin.com
              vfinn@goodwin.com
              lsullivan@goodwin.com

       This the 6th day of July, 2009.


                     */s/ Richard L. Robertson*_____
                     Richard L. Robertson, *Attorney for the Defendant*